MICHAEL BAILEY
United States Attorney
District of Arizona
MONICA EDELSTEIN
Assistant United States Attorney
Arizona State Bar No. 023098
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: monica.edelstein@usdoj.gov
Attorneys for Plaintiff

**SEALED**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>1. Frank Capri<br>   (Counts 1-16),<br><br>2. Debbie Corvo<br>   (Counts 1-6),<br><br>3. Christian Burka<br>   (Count 16),<br><br>Defendants. | No.  CR-20-00096-PHX-JJT (JZB)<br><br>**INDICTMENT**<br><br>VIO:  18 U.S.C. § 1343<br>(Wire Fraud)<br>Counts 1-5<br><br>18 U.S.C. § 1956(h)<br>(Conspiracy to Commit<br>Transactional Money Laundering)<br>Count 6<br><br>18 U.S.C. § 1957<br>(Transactional Money Laundering)<br>Counts 7-15<br><br>18 U.S.C. § 371<br>(Conspiracy to Commit Wire Fraud)<br>Count 16<br><br>18 U.S.C. §§ 981 and 982,<br>21 U.S.C.  § 853, and<br>28 U.S.C. § 2461(c)<br>(Forfeiture Allegation) |

**THE GRAND JURY CHARGES:**

**BACKGROUND**

1.  FRANK CAPRI ("CAPRI") is the owner and beneficiary of a number of

businesses primarily associated with the operation of restaurants both in Arizona and across the United States. Despite CAPRI'S control and ownership of the various businesses, he is not formally listed as the owner on relevant incorporation and trust documentation associated with the businesses. The majority of the businesses are listed in the name of CAPRI's mother DEBBIE CORVO ("CORVO"), or other nominees with ties to CAPRI.

2. In or around 2008, CAPRI operated a business known as Capri Concepts, LLC that obtained a licensing agreement with musician T.K. to construct and operate branded restaurants bearing T.K.'s name ("Branded Restaurant") throughout the United States. The first Branded Restaurant associated with CAPRI was constructed with the assistance of CAPRI's longtime associate J.F. and was opened in Mesa, Arizona in or around 2009.

3. By early 2011, CAPRI's business expanded to include five Branded Restaurants with many more locations scheduled for construction. CAPRI hired employees to assist with the expanding business including G.M. On or about January 26, 2011, G.M. incorporated Boomtown Entertainment, LLC, a Delaware corporation that acted as the parent organization overseeing the various Branded Restaurants. On August 25, 2011, Boomtown Management, LLC was incorporated as an umbrella entity to further consolidate the various restaurant entities and Boomtown Entertainment, LLC (collectively, "Boomtown"). All of the entities were collectively owned by a trust established in the name of CORVO, of which CAPRI was the beneficiary and G.M. acted as the trustee. Each individual Branded Restaurant location was incorporated under the name CRGE (location), which stands for Capri Restaurant Group Enterprises, with each restaurant having a separate bank account from the main Boomtown bank accounts. CORVO had signature authority on many of the Boomtown bank accounts.

4. With the assistance of a real estate broker, CAPRI worked directly with property development companies ("property developers") around the United States who had locations suitable for Branded Restaurant locations in order to negotiate the

construction and lease agreements ("lease agreement contract") for each prospective restaurant location.

5. The lease agreement contracts included terms for the construction of each Branded Restaurant location including terms whereby the property developers would pay tenant improvement funds ("T.I. funds") to Boomtown for the construction of the restaurants according to a specific pre-negotiated schedule outlined in the lease agreement contract. Generally, the schedule included a payment of 10% at lease signing; a payment of 10% at the start of construction; a payment of 20% when construction was 25% complete; a payment of 20% when construction was 50% complete; a payment of 20% when construction was 75% completed; and a final payment of 20% upon completion or restaurant opening. The lease agreement contract also included a negotiated rent amount that Boomtown would owe to the property developers to operate the restaurant following construction and tied in part to the T.I. funds negotiated for construction.

6. It was understood between the parties that the T.I. funds payment structure and proposed schedule of disbursements were not typical, however, property developers were incentivized to have a Branded Restaurant as part of their development both as an anchor tenant and because the negotiated future rent payments were high and often included a percentage of expected restaurant revenue.

7. Boomtown expanded quickly from 2011 through 2014 resulting in construction of close to 20 locations around the United States with an additional approximately 24 locations under lease agreement contracts. By the end of 2012, despite representations by CAPRI to property developers that there were only plans to open 4 Branded Restaurants a year, Boomtown had begun construction on 12 locations in 12 different states. From late 2011 to 2012, CAPRI was signing approximately 5 to 6 new lease agreement contracts a month.

## BOOMTOWN SCHEME

8. With CAPRI's knowledge and at his direction, Boomtown employees

devised a scheme to obtain the T.I. funds associated with the lease agreement contracts for CAPRI's personal use. In or around early 2011, CAPRI determined that Boomtown would self-perform construction effectively operating as its own general contractor on future projects in violation of the lease agreement contracts. From at least 2011 and continuing thereinafter, CAPRI instructed G.M., J.F., and other Boomtown employees to fabricate certification of construction completion documentation ("draw paperwork") to submit to the property developers in order to induce the property developers to release T.I. funds. The fraudulent draw paperwork listed fabricated general contractors, fabricated subcontractors purporting to certify completed work, forged signatures, and false notary stamps in order to make the draw paperwork appear authentic. Boomtown employees referred to the creation of the draw paperwork as "arts and crafts."

9. With CAPRI's knowledge Boomtown employees incorporated the fabricated contracting businesses and set up Virtual Offices with addresses and telephone numbers in the event a property developer attempted to verify information listed on the fraudulent draw paperwork.

10. In or around early 2012, a property developer requested that Boomtown provide the original certified draw paperwork in order to release the final draw payment. CAPRI and Boomtown employees obtained a stamp machine in order to create wet notary stamps to use on the draw paperwork rather than using photocopies. The stamp machine was kept in the Boomtown office along with a bag of notary and signature stamps.

11. Between March 2012 and November 2014, Boomtown entered into approximately 24 lease agreements that entitled Boomtown to approximately $64,802,029.66 in T.I. funds for the construction of the Branded Restaurant locations. Based on Boomtown's submission of fraudulent draw paperwork, property developers released T.I. funds directly to the entities controlled by CAPRI or Boomtown bank accounts. After obtaining the T.I. fund deposits, CAPRI diverted money for his personal use including to make payments to CORVO and other family members. CAPRI also

frequently directed employees including G.M. to divert funds out of the individual restaurant and main Boomtown bank accounts to his various personal accounts including a TD Ameritrade in the name of N & G Concepts, LLC opened in approximately December 2012. In addition, CAPRI instructed Boomtown employees to pay for his personal expenses directly from Boomtown bank accounts, individual Branded Restaurants' bank accounts, utilized debit cards associated with the Boomtown bank accounts, or instructed employees to provide him with cash.

12. As a result of CAPRI's actions, there were insufficient funds to pay Boomtown's business expenses. In or around 2014, G.M. began transferring funds from CAPRI's personal TD Ameritrade account ending in X3197 back to Boomtown accounts, in part to pay Boomtown's expenses. Nevertheless, Boomtown was not able to cover costs and as a result, there were frequent construction delays on every project during which time CAPRI would not pay rent to property developers. In addition, CAPRI would not pay to continue operating opened Branded Restaurants including taxes, and often stopped paying ongoing construction and maintenance costs. Beginning in or around 2014 into 2015, various opened Branded Restaurants failed and construction stopped on a number of incomplete projects. By the end of 2014, new lease agreement contracts were infrequent and property developers began filing lawsuits naming CAPRI and Boomtown.

13. On January 9, 2015, with the assistance of G.M. and others, Arizona Universal Holding Management, LLC ("AUH") was incorporated in order to move financially viable Branded Restaurants out from under Boomtown listed in CORVO's name and associated with CAPRI. AUH was solely owned by the Arizona Universal Holding Management Irrevocable Trust ("AUH trust") that did not name CORVO, but to which CAPRI was the beneficiary and G.M. was the trustee. With CAPRI's knowledge, the prior transfers initiated by G.M. from the TD Ameritrade account ending in X3197 were re-categorized as payments from AUH to "purchase" the viable Boomtown assets. Although the purported purchase occurred in 2015, the purchase documentation utilized

the previously made transfers in 2014 from the TD Ameritrade account ending in X3197.

## RF HOLDINGS SCHEME

14.     In or around January 2015, despite Boomtown's ongoing financial situation, CAPRI, G.M. and an associate named CHRISTIAN BURKA ("BURKA"), began negotiating to obtain a licensing agreement to construct and operate similar restaurants with R.F., a different music group ("Second Branded Restaurant"). The licensing agreement with R.F. was entered in or around April 2015. CAPRI's new business was incorporated under the name RF Holdings Group, LLC but was solely owned by RF Holdings Group Irrevocable Trust (collectively, "RF Holdings") held in the name of another CAPRI nominee in order to conceal CAPRI's beneficial interest; CORVO's name was not utilized in order to conceal the new business' connection to Boomtown related entities. Initially, CAPRI owned 70% of the new business, BURKA owned 20%, and G.M. owned 10%.

15.     In or around early September 2015, CAPRI discovered that G.M. had embezzled funds and G.M. subsequently left the company. In February 2016, at the behest of CAPRI, G.M. and others created documentation substituting a CAPRI nominee in place of G.M. as 10% owner and manager of RF Holdings. Although the documents were actually executed almost one year later, the documents were backdated to reflect the date of the original licensing and ownership agreements associated with the Second Branded Restaurants.

16.     Between November 2015 and approximately November 2017, CAPRI, BURKA, and others negotiated lease agreement contracts to construct and operate Second Branded Restaurant locations including, amongst others, locations in Connecticut and Ohio. In CAPRI's place, BURKA and a CAPRI nominee held themselves out as the principals associated with each proposed Second Branded Restaurant to conceal CAPRI's involvement from property developers, landlords, and contractors. As a result, property developers entered into lease agreement contracts for the construction of the Second Branded Restaurants without knowing about CAPRI's involvement and RF Holding's

association with Boomtown.

17. The structure of the Second Branded Restaurants' negotiated lease agreement contracts were substantially similar to the lease agreement contracts used for the Branded Restaurants although the contract prices were lower because the Second Branded Restaurants were designed to be smaller spaces. Like the Branded Restaurants, each new Second Branded Restaurant was incorporated individually as a RF Restaurant (Number), LLC, and had a separate bank account.

18. Although a CAPRI nominee opened each bank account associated with the Second Branded Restaurant locations, CAPRI and BURKA told the nominee when deposits into the various accounts were expected and directed the nominee as to all outgoing transactions associated with the accounts.

## WIRE FRAUD SCHEME

19. The factual allegations in Paragraphs 1 to 18 are re-alleged and incorporated as though fully set forth herein.

20. From in or about May 2011 to in or about September 2015, Defendants CAPRI, CORVO, and others known and unknown to the grand jury, devised and intended to devise a scheme to defraud property developers, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that:

21. Defendants CAPRI and CORVO fraudulently concealed CAPRI's ownership and control of Boomtown and its related entities on documentation associated with the business.

22. Defendant CAPRI and others provided inflated financial projections to property developers in order to negotiate favorable lease agreement contracts with high T.I. allowances for the construction of Branded Restaurant locations.

23. Defendant CAPRI and others self-performed construction in violation of the

lease agreement contracts by paying general contractors to utilize their license information that was subsequently listed on fraudulent draw paperwork submitted to property developers.

24. Defendant CAPRI and others created fictitious general and subcontractor entities and attempted to legitimize these entities by incorporating them and creating contact information to further conceal the fraudulent nature of the draw paperwork.

25. Defendant CAPRI and others utilized a stamp machine to create notary and signature stamps in a further attempt to legitimize the fraudulent draw paperwork.

## COUNTS 1 - 5
## 18 U.S.C. § 1343
## (Wire Fraud)

26. Paragraphs 1 to 25 are re-alleged and incorporated by reference as though fully set forth herein.

27. On or about each of the dates set forth below, in the District of Arizona and elsewhere, Defendants FRANK CAPRI and DEBBIE CORVO, and others known and unknown to the grand jury, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below into JP Morgan Chase bank accounts in the name of Boomtown entities as listed below, each transmission constituting a separate count:

| Count | On or About | Deposit Account | Amount |
|-------|-------------|-----------------|--------|
| 1 | 5/1/2015 | Account Ending X5278 in the name of CRGE San Antonio | $437,500.00 |
| 2 | 5/11/2015 | Account Ending X2852 in the name of CRGE Anaheim LLC | $112,452.00 |
| 3 | 5/18/2015 | Account Ending X2852 in the name of CRGE Anaheim LLC | $15,280.00 |

| | | | |
|---|---|---|---|
| 4 | 7/10/2015 | Account Ending X2852 in the name of CRGE Anaheim LLC | $50,240.00 |
| 5 | 7/15/2015 | Account Ending X2852 in the name of CRGE Anaheim LLC | $38,571.43 |
| | | | **$654,043.43** |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 6
## 18 U.S.C. § 1956(h)
## (Money Laundering Conspiracy)

28. Paragraphs 1 to 27 are re-alleged and incorporated by reference as though fully set forth herein.

29. From in or around May 2011 to in or around February 2016, the exact dates being unknown, in the District of Arizona and elsewhere, Defendants FRANK CAPRI, DEBBIE CORVO, together and with others, both known and unknown to the grand jury, did knowingly, intelligently, and unlawfully combine, conspire, confederate, and agree to knowingly commit the following offense against the United States, namely Title 18 United States Code, Section 1957 (Transactional Money Laundering).

### MANNER AND MEANS OF THE CONSPIRACY

30. At CAPRI's direction, Boomtown employees diverted T.I. funds deposited by property developers from Boomtown accounts to CAPRI's personal bank accounts.

31. At CAPRI's direction, Boomtown employees paid CAPRI's personal expenses directly from Boomtown or individual Branded Restaurants' bank accounts.

32. At CAPRI's direction, Boomtown employees transferred funds from Boomtown accounts to accounts controlled by CORVO.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 7-15
## 18 U.S.C. § 1957
### (Transactional Money Laundering)

33. Paragraphs 1 through 32 are re-alleged and incorporated as though fully set forth herein.

34. On or about the dates set forth below, in the District of Arizona, and elsewhere, Defendants FRANK CAPRI, and others both known and unknown to the grand jury, did knowingly engage and attempt to engage in the following monetary transactions through or to a financial institution, affecting interstate or foreign commerce, and within the United States, in criminally derived property of a value greater than $10,000, that is, the electronic transfer of funds, such property having been derived from a specified unlawful activity, that is, wire fraud, each transaction representing a separate count:

| Count | On or about | Monetary Transaction |
|---|---|---|
| 7 | 5/1/2015 | Wire transfer for $164,000 from account ending X5278 to account ending in X3059 |
| 8 | 5/1/2015 | Wire transfer for $130,000 from account ending X5278 to account ending in X0999 |
| 9 | 5/1/2015 | Wire transfer for $20,000 from account ending X5278 to account ending in X0999 |
| 10 | 5/1/2015 | Wire transfer for $30,000 from account ending X5278 to account ending in X0999 |
| 11 | 5/11/2015 | Wire transfer for $16,000 from account ending X2852 to account ending in X1608 |
| 12 | 5/12/2015 | Wire transfer for $27,000 from account ending X2852 to account ending in X0663 |
| 13 | 7/13/2015 | Wire transfer for $20,000 from account ending X2852 to account ending in X0999 |

| 14 | 7/13/2015 | Wire transfer for $20,000 from account ending X2852 to account ending in X0999 |
| 15 | 7/17/2015 | Wire transfer for $15,000 from account ending X2852 to account ending in X0999 |

All in violation of Title 18, United States Code, Section 1957.

## COUNT 16
## 18 U.S.C. § 371
### (Conspiracy to Commit Wire Fraud)

35.  Paragraphs 1 through 34 are re-alleged and incorporated as though fully set forth herein.

36.  From in or around January 2015 through February 2017, the exact dates being unknown, in the District of Arizona and elsewhere, Defendants FRANK CAPRI, CHRISTIAN BURKA, and others known and unknown to the grand jury, did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other, and with other individuals, both known and unknown, to knowingly execute and attempt to execute a scheme or artifice to defraud and to obtain funds from property developers, by means of materially false and fraudulent pretenses, representations, and promises in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

### MANNER AND MEANS OF CONSPIRACY

37.  Among the manner and means by which CAPRI, BURKA and their co-conspirators carried out the conspiracy were the following:

a.  CAPRI, BURKA and others deliberately disassociated the Second Branded Restaurants from CAPRI and Boomtown by establishing and utilizing trusts to conceal CAPRI and Boomtown's involvement.

b.  Although CAPRI exercised all decision making authority associated with the Second Branded Restaurants, BURKA and others interacted with property developers,

contractors, and landlords to conceal CAPRI's involvement.

c. CAPRI and BURKA directed all financial transactions involving bank accounts associated with the Second Branded Restaurants.

## OVERT ACTS

38. In furtherance of the conspiracy, and to affect the objects and purposes thereof, the following overt acts, among others, occurred within the District of Arizona, and elsewhere.

a. On or about January 7, 2015, CAPRI and others began negotiating a Letter of Intent to obtain the exclusive right to negotiate with property developers to construct and operate Second Branded Restaurant locations throughout the United States.

b. In or around March 10, 2015, CAPRI, BURKA, and others met with representatives to finalize the licensing agreement associated with the Second Branded Restaurants.

c. In or around April 2015, CAPRI, BURKA, and others finalized their ownership interest in RF Holdings and concealed CAPRI's involvement by listing the new venture in the name of BURKA and other nominees.

d. In or around February 2016, CAPRI and others created RF Trust listing a CAPRI nominee as the trustee but dated the paperwork to the original initiation date in April 2015.

e. On or about February 25, 2016, at CAPRI's direction, RF IP, LLC was incorporated in Nevada and listed BURKA and a CAPRI nominee as the managing officers.

f. On multiple occasion between November 2015 through February 2017, at CAPRI's direction, multiple RF Restaurant, LLC entities were incorporated as each new Second Branded Restaurant lease agreement was signed.

g. On multiple occasions between February 2016 through February 2017, at the direction of CAPRI, BURKA, and others, a CAPRI nominee opened bank accounts for

each Second Branded Restaurant location under a lease agreement contract for the deposit of T.I. funds.

      h.    On multiple occasions between February 2016 and February 2017, a CAPRI nominee conducted financial transactions by wiring funds to third parties at the direction of CAPRI and BURKA.

      All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

      39.    The grand jury re-alleges and incorporates the allegations of Counts 1 through 16 of this Indictment, which are incorporated by reference as though fully set forth herein.

      40.    Pursuant to Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853 and Title 28, United States Code, Section 2461(c), and upon conviction of one or more of the offenses alleged in Counts 1 through 16 of this Indictment, the Defendant(s) shall forfeit to the United States all right, title, and interest in any and all property, real or personal, involved in such offense(s), or any property traceable to such property involved in the offense(s), or conspiracy to commit such offense(s), including: a sum of money equal to at least $64,802,029.66 in United States currency, representing the amount of money involved in the offense(s).

      41.    If any of the above-described forfeitable property, as a result of any act or omission of the Defendant(s):

      (1) cannot be located upon the exercise of due diligence,

      (2) has been transferred or sold to, or deposited with, a third party,

      (3) has been placed beyond the jurisdiction of the court,

      (4) has been substantially diminished in value, or

      (5) has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States to seek forfeiture of any other property of said Defendant(s) up to the value of the above-described forfeitable property, pursuant to Title 21, United States Code, Section 853(p).

All in accordance with Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, Title 28, United States Code, Section 2461(c), and Rule 32.2, Federal Rules of Criminal Procedure.

A TRUE BILL

s/
FOREPERSON OF THE GRAND JURY
Date: January 28, 2020

MICHAEL BAILEY
United States Attorney
District of Arizona

s/
MONICA EDELSTEIN
Assistant U.S. Attorney